# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| **GREATGIGZ SOLUTIONS, LLC,**<br><br>Plaintiff<br><br>v.<br><br>**MAPLEBEAR INC. DBA INSTACART**<br><br>Defendant | **Case No. 6:20-cv-00737**<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

GreatGigz Solutions, LLC ("Plaintiff") hereby files this Original Complaint for Patent Infringement against Maplebear Inc. DBA Instacart ("Instacart" or "Defendant"), and alleges, On information and belief, as follows:

## THE PARTIES

1.    GreatGigz Solutions, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 600 S. Dixie Highway, Suite 605, West Palm Beach, Florida 33401.

2.    On information and belief, Maplebear Inc. DBA Instacart ("Instacart") is a domestic corporation organized and existing under the laws of Delaware, with a principal place of business located in San Francisco, California.  Instacart may be served through its registered agent in the State of Texas at Cogency Global, Inc., 1601 Elm Street, Suite 4360, Dallas, Texas 7520. On information and belief, Instacart sells and offers to sell products and services throughout the State of Texas, including in this judicial District, and introduces services via its infringing systems into the

stream of commerce knowing and intending that they would be extensively used in the State of Texas and in this judicial District.   On information and belief, Instacart specifically targets customers in the State of Texas and in this judicial District.

### JURISDICTION AND VENUE

3.   This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338.

4.   This Court has personal jurisdiction over Defendant.   Defendant has continuous and systematic business contacts with the State of Texas.   Defendant directly conducts business extensively throughout the State of Texas, by distributing, making, using, offering for sale, selling, and advertising (including the provision of interactive web pages and mobile applications) its services in the State of Texas and in this District.   Defendant has purposefully and voluntarily made its infringing systems available to residents of this District and into the stream of commerce with the intention and expectation that they will be purchased and used by consumers in this District.   On information and belief, Instacart fulfills millions of orders using the infringing systems and methods.   *See*  https://en.wikipedia.org/wiki/Instacart;  *see also* https://tech.instacart.com/3-million-instacart-orders-open-sourced-d40d29ead6f2

5.   On information and belief, Defendant maintains an ongoing and continuous business presence in the State of Texas and specifically within this District, which is illustrated by the fact that Instacart has employees residing within this District.   *See, e.g.,* https://instacart.wordpress.com/tag/texas/

6.   Venue is proper in the Western District of Texas as to Defendant pursuant to at least 28 U.S.C. §§ 1391(c)(2) and 1400(b).   As noted above, Defendant maintains a regular and established business presence in this District.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                    2

**PATENTS-IN-SUIT**

7.      GreatGigz Solutions, LLC is the owner, by assignment, of U.S. Patent Nos. 6.662,194 ("the '194 Patent"); 7,490,086 ("the '086 Patent"); 9,760,864 ("the '864 Patent"); and 10,096,000 ("the '000 Patent") (hereinafter collectively referred to as "the GGS Patents").

8.      The GGS Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

9.      The inventions described and claimed in the GGS Patents were invented by Raymond Anthony Joao.

10.     The GGS Patents each include numerous claims defining distinct inventions.

11.     The priority date of each of the GGS Patents is at least as early as July 31, 1999.  As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.

12.     For example, and as evidence of the stated non-routine aspects of the inventions, during prosecution of the '864 Patent, the patent examiner considered whether the claims of the '864 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  The patent examiner affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because all pending claims are directed to patent-eligible subject matter, because none of the pending claims are directed to an abstract idea, and because there would be no preemption of the abstract idea or the field of the abstract idea.

13.     GreatGigz Solutions, LLC alleges infringement on the part of Defendant of the '194 Patent, the '086 Patent, the '864 Patent, and the '000 Patent (collectively as the "Asserted Patents").

14.     The '194 Patent relates generally to an apparatus and method for providing recruitment information, including a memory device for Storing information regarding at least one of a job opening, a position, an assignment, a contract, and a project, and information regarding a job Search request, a processing device for processing information regarding the job Search request On a detection of an occurrence of a Searching event, wherein the processing device utilizes information regarding the at least one of a job opening, a position, an assignment, a contract, and a project, Stored in the memory device, and further wherein the processing device generates a message containing information regarding at least one of a job opening, a position, an assignment, a contract, and a project, wherein the message is responsive to the job Search request, and a transmitter for transmitting the message to a communication device associated with an individual in real-time. *See* Abstract, '194 Patent.

15.     The '086 Patent relates generally to an apparatus, including a memory device which stores information regarding a job opening, position, assignment, contract, or project, and information regarding a job search request or inquiry, a processing device which processing the information regarding a job search request or inquiry On an automatic detection of an occurrence of a searching event which is an occurrence of a job posting, a posting of new or revised data or information, a news release of a business event, an employment-related event, an economic report, industry-specific news, an event which creates an to fill a position, or an event which creates an interest to seek a position, and generates a message, containing the information regarding a job opening, position, assignment, contract, or project, responsive to the job search request or inquiry, and a transmitter which transmits the message to a communication device associated with an individual. *See* Abstract, '086 Patent.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          4

16.     The '864 Patent relates generally to an apparatus, including a memory device for storing work schedule information or scheduling information for an individual, a transmitter for transmitting a job search request to a computer, wherein the computer is specially programmed for processing the job search request, for generating a message containing information regarding a job opening, a position, an assignment, a contract, or a project, and for transmitting the message to the apparatus in response to the job search request; a receiver for receiving the message; and a display for displaying at least some of the information contained in the message.  *See* Abstract, '864 Patent.

17.     The '000 Patent relates generally to an apparatus, including a memory which stores work schedule information or scheduling information for an employer, hiring entity, individual, independent contractor, temporary worker, or freelancer; a receiver which receives a first request to obtain work schedule information or scheduling information for the employer, hiring entity, individual, independent contractor, temporary worker, or freelancer, and the first request is received from a first communication device; a processing device, specially programmed for processing information contained in the first request, generates a first message containing the work schedule or scheduling information for the employer, hiring entity, individual, independent contractor, temporary worker, or freelancer; and a transmitter for transmitting the first message to the first communication device or to a second communication device.   The apparatus processes information in a second request.  Information contained in the second request is based on the work schedule information or the scheduling information contained in the first message. *See* Abstract, '000 Patent.

18.     As noted, the claims of the Asserted Patents claim priority to at least July 31, 1999.  At that time, the idea of launching Instacart.com was still several years away.

19.   The claims of the Asserted Patents are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, was not conventional or routine at the time of the invention.

20.   Further, the claims of the Asserted Patents contain inventive concepts which transform the underlying non-abstract aspects of the claims into patent-eligible subject matter.

21.   Consequently, the claims of the Asserted Patents recite systems and methods resulting in improved functionality of the claimed systems and represent technological improvements to the operation of computers.

22.   The claims of the Asserted Patents overcome deficiencies existing in the art as of the date of invention, and comprise non-conventional approaches that transform the inventions as claimed into substantially more than mere abstract ideas.  For example, as of the date of invention, "[j]ob searching activities and recruitment activities typically require efforts in introducing parties to one another, pre-screening the parties prior to, and/or subsequent to, an introduction, acting as an information gathering entity for a party, exchanging information in order to determine if a relationship is appropriate and/or desirable, negotiating a deal, and/or consummating a deal between the respective parties.  While individuals and/or employers and/or hiring entities can act on their own behalf during most of the process, one of the parties may typically enlist the efforts of an employment agency or agencies, a recruiter(s), a so-called 'headhunter(s)', an employment and/or career consultant(s), a temporary employment agency or agencies, a personal agent(s), a personal manager(s), and/or another intermediary or intermediaries, sometimes at great expense."  '194 Patent at 1:59-2:6.  The inventions as claimed overcome these deficiencies in the state of the art, and provide substantial cost savings to all parties.  As explained, as of the date of

invention, "[t]he enlistment of employment agencies, recruiters, so-called 'headhunters', employment and/or career consultants, temporary employment agencies, personal agents, personal managers, and/or other intermediaries, can be costly and can lead to job search efforts and/or recruitment efforts which may be limited in breadth and/or scope by the personal and/or individual contacts, limitations and/or constraints associated with the employment agency, recruiter, so-called 'headhunter', employment and/or career consultant, temporary employment agency, personal agent, personal manager, and/or other intermediary." *Id.* at 2:7-17.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for a costly middle-man in the process is overcome. *Id.* at 2:18-24; 6:45-55.

23.   The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time.  As explained, as of the date of invention, "[j]ob searching efforts and recruitment efforts may be limited by and/or be constrained by limited personal contacts, geographical constraints, monetary constraints, and/or time constraints.  Oftentimes, individuals, employers and/or hiring entities, do not have the resources to conduct their own respective job searching efforts or recruitment efforts.  The enlistment of employment agencies, recruiters, so-called 'headhunters', employment and/or career consultants, temporary employment agencies, personal agents, personal managers, and/or other intermediaries, may not be sufficient to overcome these limitations and/or constraints, particularly, if the respective employment agency or agencies, recruiter(s), so-called 'headhunter(s)', employment and/or career consultant(s), temporary employment agency or agencies, personal agent(s), personal manager(s) and/or other intermediary or intermediaries, are working with similar limitations and/or constraints." *Id.* at 2:26-42.  As such, the inventions as

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                        7

claimed provide non-conventional solutions to the conventional problems of the day because the need for extensive personal contacts and geographical proximity are overcome.

24. The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time. As explained, as of the date of invention, "[t]he job search process and/or the recruitment process can typically be rendered more difficult in instances when additional information may be requested by one or by both of the parties concerning a counterpart. This typically results in time delays and/or additional expense to the party having to comply with such a request." *Id.* at 2:43-48. As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for time-consuming delays is overcome.

25. The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time. As explained, as of the date of invention, "[j]ob searching efforts and/or recruitment efforts may further be rendered more difficult when the parties are not properly pre-screened, thereby resulting in wasted time and effort, and/or when the parties are not properly informed as to the needs and/or demands of a counterpart. The needs and/or demands can include job description, job needs, project description, assignment description, salary, compensation, and/or other related information. The failure to pre-screen the parties and/or to conduct a dialog and/or initiate interviews and/or discussions when the parties may be so far apart regarding their respective needs, requests and/or expectations, for example, those involving job duties and/or salary, can result in wasted time and effort." *Id.* at 2:49-61. As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the associated time and effort are reduced, resulting in more efficient processes and cost savings for all involved.

26.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time.  As explained, as of the date of invention, "[c]onfidentiality is typically another concern in job searching activities and/or in recruitment activities.  Individuals, employees, and/or hiring entities may have an interest in, and/or a desire for, maintaining confidentiality during at least some initial stages of any job search and/or recruitment effort.  In some instances, once an initial interest is expressed, any confidentiality which may have existed may be lost for the remainder of the process.  Sometimes, it may be desirable for an individual, an employer and/or hiring entity, to retain at least some level of confidentiality and/or anonymity further into the job search and/or recruitment process.  In this manner, at least some confidentiality and/or anonymity can be preserved, especially if a deal between the parties is not ultimately reached." *Id.* at 2:62-3:8.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for confidentiality in the process is enhanced.  *See id.* at 6:59-65.

27.     As noted above, during prosecution of the '864 Patent, the patent examiner considered whether the claims of the '864 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  The patent examiner expressly found that the claims are in fact patent eligible under 35 USC §101 because all pending claims are directed to patent-eligible subject matter, none of the pending claims are directed to an abstract idea, and there would be no preemption of the abstract idea or the field of the abstract idea.  For these same reasons, all of the claims of the Asserted Patents are patent-eligible.

28.     The '194 Patent was examined by Primary United States Patent Examiner Franz Colby.  During the examination of the '194 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 705/1, 10, 11, 705/26, 707/104.1, 10, 3, and 103R.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                           9

29.     After conducting a search for prior art during the examination of the '194 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 5,164,897, 11/1992, Clark et al.; (ii) 5,832,497, 11/1998, Taylor; (iii) 5,884.270, 3/1999, Walker et al.; (iv) 5,884.272, 3/1999, Walker et al.; (v) 5,978,768, 11/1999, McGovern et al.; (vi) 6,324,538, 11/2001, Wesinger, Jr. et al.; (vii) 6,332,125, 12/2001, Callen et al.; (viii) 6,363,376, 3/2002, Wiens et al.; (ix) 6,370,510, 4/2002, McGovern et al.; (x) 6,381,592, 4/2002, Reuning; and (xi) 6,385,620, 5/2002, Kurzius et al.

30.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '194 Patent to issue.  In so doing, it is presumed that Examiner Colby used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Colby has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

31.     The '194 Patent is a pioneering patent, and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Ricoh, Robert Half International, IBM, Yahoo!, Oracle, Amazon, Monster, and CareerBuilder.

32.     The '086 Patent was examined by Primary United States Patent Examiner Jean M. Corrielus.  During the examination of the '086 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 707/104.1, 707/3, 10, 103R, 1, 2, 4, 5, 705/1, 10, 11, and 705/26.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    10

33.   After conducting a search for prior art during the examination of the '086 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 4,625,081, 11/1986, Lotito et al.; (ii) 5,164,897, 11/1992, Clark et al.; (iii) 5,978,768, 11/1999, McGovern et al.; (iv) 6,370,510, 4/2002, McGovern et al.; (v) 6,381,592, 4/2002, Reuning; (vi) 6,385,620, 5/2002, Kurzius et al.; (vii) 6,567,784, 5/2003, Bukow; (viii) 6,662,194, 12/2003, Joao; (ix) 6,873,964, 3/2005, Williams et al.; (x) 7,148,991, 12/2006, Suzuki et al.; and (xi) 2003/020531, 6/2003, Parker.

34.   After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '086 Patent to issue.  In so doing, it is presumed that Examiner Corrielus used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Corrielus has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

35.   The '086 Patent is a pioneering patent, and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Xerox, Yahoo!, EDS, Microsoft, CareerBuilder, Monster, LinkedIn, and IBM.

36.   The '864 Patent was examined by Primary United States Patent Examiner Jean M. Corrielus.  During the examination of the '864 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 707/758.

37. After conducting a search for prior art during the examination of the '864 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 5,164,897, 11/1992, Clark; (ii) 5,758,324, 5/1998, Hartman; (iii) 5,832,497, 11/1998, Taylor; (iv) 5,862,223, 1/1999, Walker; (v) 5,884,270, 3/1999, Walker; (vi) 5,884,272, 3/1999, Walker; (vii) 5,978,768, 11/1999, McGovern; (viii) 6,157,808, 12/2000, Hollingsworth; (ix) 6,266,659, 7/2001, Nadkarni; (x) 6,370,510, 4/2002, McGovern; (xi) 6.381,592, 4/2002, Reuning; (xii) 6,398,556, 6/2002, Ho; (xiii) 6,408,337, 6/2002, Dietz; (xiv) 6,409,514, 6/2002, Bull; (xv) 6,466,91, 10/2002, Mitsuoka; (xvi) 6,718,340, 4/2004, Hartman; (xvii) 6,873,964, 3/2005, Williams; (xviii) 7,054,821, 5/2006, Rosenthal; (xix) 7,305,347, 12/2007, Joao; (xx) 7,523,045, 4/2009, Walker; (xxi) 2001/0042000 Al, 11/2001, Defoor, Jr.; (xxii) 2002/0002476 A1, 1/2002, Mitsuoka; (xxiii) 2002/0152316 A1, 10/2002, Dietz; and (xxiv) 2005/0010467 A1, 1/2005, Dietz.

38. After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '864 Patent to issue.  In so doing, it is presumed that Examiner Corrielus used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Corrielus has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

39. The '864 Patent is a pioneering patent, and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                    12

technology leaders as Ricoh, Robert Half International, IBM, Yahoo!, Xerox, Amazon, Monster, HP, CareerBuilder, Microsoft, LinkedIn, and General Electric.

40.     The '000 Patent was examined by Primary United States Patent Examiner Jean M. Corrielus. During the examination of the '000 Patent, the United States Patent Examiner searched for prior art across multiple classifications.

41.     After conducting a search for prior art during the examination of the '000 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 5,884,272, 3/1999, Walker; (ii) 6,266,659, 7/2001, Nadkarni; (iii) 6,370,510, 4/2002, McGovern; (iv) 6,457,005, 9/2002, Torrey, (v) 7,305,347, 12/2007, Joao; and (vi) 2002/0120532 A1, 8/2002, McGovern.

42.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '000 Patent to issue.  In so doing, it is presumed that Examiner Corrielus used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Corrielus has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

43.     The '000 Patent is a pioneering patent, and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Ricoh, Robert Half International, General Electric, IBM, AT&T, HP, Yahoo!, Xerox, Monster, Amazon, CareerBuilder, Microsoft, Oracle, and LinkedIn.

44.     The claims of the Asserted Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration. *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

## THE ACCUSED INSTRUMENTALITIES

45.     On information and belief, Defendant makes, sells, advertises, offers for sale, uses, or otherwise provides the Instacart website and its ancillary sites, including its various Mobile Applications, in the United States.  The Instacart apparatus comprises servers, hardware, software, and a collection of related and/or linked web pages and mobile applications for providing job search and/or recruitment services to individuals (including job seekers, contractors, and employers) in the United States.  The Instacart system comprises an apparatus with multiple interconnected infrastructures that infringe the Asserted Patents.  The public-facing aspect of the Instacart apparatus is the Instacart website, which is available at www.Instacart.com, together with the associated Instacart Mobile Applications for Consumers and Drivers, respectively.  Collectively, all of the foregoing comprises the "Accused Instrumentalities."

## COUNT I
## Infringement of U.S. Patent No. 6,662,194

46.     Plaintiff incorporates the above paragraphs by reference.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          14

47.    Defendant has been on actual notice of the '194 Patent at least as early as the date it received service of this Original Complaint.

48.    On information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

49.    On information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 25 of the '194 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

50.    The Accused Instrumentalities comprise an apparatus for providing recruitment information. The infringing apparatus comprises servers, hardware, software, and a collection of related and/or linked web pages and mobile applications for providing recruitment information and services to individuals (including individuals, independent contractors, temporary workers, and/or freelancers) in the United States.   On information and belief, the Accused Instrumentalities comprise an apparatus with multiple interconnected infrastructures, including but not limited to multiple data centers, including Amazon Web Services ("AWS") data centers located across the United States.

## The Solution

- Started using AWS CodeDeploy to deploy all front-end and back-end services including consumer-facing websites, APIs, mobile apps, internal tools, messaging infrastructure, and processing systems

- CodeDeploy works with Instacart's existing continuous integration and delivery pipeline setup

- Engineers use the CodeDeploy console and CodeDeploy APIs to monitor the status of each deployment

- Uses CodeDeploy's deployment configurations options depending on the application being deployed and its SLA—rolling updates for consumer-facing web services and all-at-once or half-at-once updates for background job processing systems

- Uses CodeDeploy's lifecycle event hooks to automatically trigger scripts at different stages of each deployment, ensuring the proper configuration and libraries are automatically installed, verifying that applications are booted correctly, and notifying them if rollback updates have failed

*See* https://aws.amazon.com/solutions/case-studies/instacart/

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    15



**Instacart**

Instacart helps people cross grocery shopping off their to-do lists with just a few clicks. Customers use the Instacart website or app to fill their virtual shopping cart with items from their favorite, local stores and Instacart connects them with shoppers who hand pick the items and deliver them straight to their door. Founded in San Francisco in 2012, Instacart has quickly scaled to over 70 markets nationwide and partnered with retailers across the United States, including popular national chains (Whole Foods Market, Costco, Petco) as well as local, regional grocers (Publix, Wegmans). By combining a personal touch with cutting-edge technology, Instacart offers customers a simple solution to save time and eat fresh food from the most trusted grocery brands. Instacart is the only grocery service that can meet today's on-demand lifestyle by delivering in as little as one hour. The startup uses Amazon CloudFront for its Content Delivery Network (CDN). "We love the way CloudFront seamlessly integrates with the rest of AWS and allows us to be very efficient in the ways we develop, deploy, and manage our infrastructure." Udi Nir, VP of Engineering, Instacart.

*See* https://aws.amazon.com/cloudfront/customers/

Amazon CloudFront is a fast content delivery network (CDN) service that securely delivers data, videos, applications, and APIs to customers globally with low latency, high transfer speeds, all within a developer-friendly environment. CloudFront is integrated with AWS – both physical locations that are directly connected to the AWS global infrastructure, as well as other AWS services. CloudFront works seamlessly with services including AWS Shield for DDoS mitigation, Amazon S3, Elastic Load Balancing or Amazon EC2 as origins for your applications, and Lambda@Edge to run custom code closer to customers' users and to customize the user experience. Lastly, if you use AWS origins such as Amazon S3, Amazon EC2 or Elastic Load Balancing, you don't pay for any data transferred between these services and CloudFront.

**Fast & global**

The Amazon CloudFront content delivery network (CDN) is massively scaled and globally distributed. The CloudFront network has 217 points of presence (PoPs), and leverages the highly-resilient Amazon backbone network for superior performance and availability for your end users.

*See* https://aws.amazon.com/cloudfront/

51.     On information and belief, the Instacart Accused Instrumentalities comprise data centers housing memory devices, processing devices, receivers, and transmitters.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    16

## The Solution

- Started using **AWS CodeDeploy** to deploy all front-end and back-end services including consumer-facing websites, APIs, mobile apps, internal tools, messaging infrastructure, and processing systems

- CodeDeploy works with Instacart's existing continuous integration and delivery pipeline setup

- Engineers use the CodeDeploy console and CodeDeploy APIs to monitor the status of each deployment

- Uses CodeDeploy's deployment configurations options depending on the application being deployed and its SLA—rolling updates for consumer-facing web services and all-at-once or half-at-once updates for background job processing systems

- Uses CodeDeploy's lifecycle event hooks to automatically trigger scripts at different stages of each deployment, ensuring the proper configuration and libraries are automatically installed, verifying that applications are booted correctly, and notifying them if rollback updates have failed

*See* https://aws.amazon.com/solutions/case-studies/instacart/



### Instacart

Instacart helps people cross grocery shopping off their to-do lists with just a few clicks. Customers use the Instacart website or app to fill their virtual shopping cart with items from their favorite, local stores and Instacart connects them with shoppers who hand pick the items and deliver them straight to their door. Founded in San Francisco in 2012, Instacart has quickly scaled to over 70 markets nationwide and partnered with retailers across the United States, including popular national chains (Whole Foods Market, Costco, Petco) as well as local, regional grocers (Publix, Wegmans). By combining a personal touch with cutting-edge technology, Instacart offers customers a simple solution to save time and eat fresh food from the most trusted grocery brands. Instacart is the only grocery service that can meet today's on-demand lifestyle by delivering in as little as one hour. The startup uses Amazon CloudFront for its Content Delivery Network (CDN). "We love the way CloudFront seamlessly integrates with the rest of AWS and allows us to be very efficient in the ways we develop, deploy, and manage our infrastructure." Udi Nir, VP of Engineering, Instacart.

*See* https://aws.amazon.com/cloudfront/customers/

Amazon CloudFront is a fast content delivery network (CDN) service that securely delivers data, videos, applications, and APIs to customers globally with low latency, high transfer speeds, all within a developer-friendly environment. CloudFront is integrated with AWS – both physical locations that are directly connected to the AWS global infrastructure, as well as other AWS services. CloudFront works seamlessly with services including AWS Shield for DDoS mitigation, Amazon S3, Elastic Load Balancing or Amazon EC2 as origins for your applications, and Lambda@Edge to run custom code closer to customers' users and to customize the user experience. Lastly, if you use AWS origins such as Amazon S3, Amazon EC2 or Elastic Load Balancing, you don't pay for any data transferred between these services and CloudFront.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

> **Fast & global**
>
> The Amazon CloudFront content delivery network (CDN) is massively scaled and globally distributed. The CloudFront network has 217 points of presence (PoPs), and leverages the highly-resilient Amazon backbone network for superior performance and availability for your end users.

*See* https://aws.amazon.com/cloudfront/

52.     The Instacart Accused Instrumentalities comprise a memory device, which stores information regarding at least work schedule information and/or scheduling information for individual shoppers in the Instacart network, each of whom are, on information and belief, employed by Instacart as independent contractors.

> If you already provide services as a personal shopper or are involved in the grocery or transportation industries (such as a courier, driver, truck driver, professional driver, taxi driver, food delivery driver), you might want to consider shopping with Instacart. We welcome interested individuals from an array of industries and backgrounds. Shopping on the Instacart platform is great for anyone looking for flexible, seasonal, home-based, entry-level, weekend, weekday, afterschool, or temporary opportunities.
>
> Instacart is committed to diversity and providing equal opportunities for independent contractors. Instacart considers qualified individuals without regard to gender, sexual orientation, race, veteran, disability status, or other categories protected by applicable law.
>
> Instacart also values providing prospective contractors with a fair chance to pursue opportunities. Instacart evaluates criminal histories in accordance with this value and applicable local, state, and federal laws, and tailors any consideration of criminal histories to the requirements of the contract engagement sought. For all individuals seeking to provide services in San Francisco, Los Angeles, and Philadelphia, Instacart considers individuals in a manner consistent with the requirements of applicable Fair Chance ordinances.
>
> Review the Independent Contractor Agreement here

*See* https://shoppers.instacart.com/role/full-service#role-description

> **Full-service shopper** Shoppers get paid per batch that they complete. Instacart provides estimates for your earnings on every order as well as total earnings for the week. The amount you earn per batch of orders depends on the number of items, type of items, driving distance, and effort involved in shopping and delivering. You keep 100% of customer tips. You also get opportunities to earn extra through promotions Instacart runs.
> As independent contractors, full-service shoppers have the flexibility to work as little or as often as they want. This means that total earnings potential depends on the individual.

*See* https://shoppers.instacart.com/role/full-service

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    18

53.     The Instacart Accused Instrumentalities store work schedule information for each such shopper

(independent contractor) by virtue of the Instacart Shopper App, which allows shoppers to set

their availability for shopping gigs.  Shoppers are notified of open delivery opportunities shortly

before the shopper's period of availability starts.



*See* https://apps.apple.com/us/app/instacart-shopper/id1454056744

Full-service shoppers dictate their own schedule and can pick up gigs
two ways:

• **Set your availability in the Shopper app.** You'll be notified of
open delivery opportunities shortly before your period of
availability starts. It's up to you to promptly accept or reject each
offer. If you accept, you'll go to the designated partner store
selected by the customer and start shopping to fulfill the order.

• **Pick up on-demand shopping opportunities.** Shoppers can set
their app to notify them whenever an order is available in their
area. Then, they review the details — store location, number of
items and estimated payment — and accept the order.

*See* https://www.nerdwallet.com/article/finance/instacart-shopper-make-money

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          19

**Full-service shopper** Shoppers get paid per batch that they complete. Instacart provides estimates for your earnings on every order as well as total earnings for the week. The amount you earn per batch of orders depends on the number of items, type of items, driving distance, and effort involved in shopping and delivering. You keep 100% of customer tips. You also get opportunities to earn extra through promotions Instacart runs.
As independent contractors, full-service shoppers have the flexibility to work as little or as often as they want. This means that total earnings potential depends on the individual.

*See* https://shoppers.instacart.com/role/full-service

54.     The Instacart Accused Instrumentalities comprise a receiver for receiving a first request from a communication device associated with a hiring entity (*e.g.,* the user of the Instacart Mobile App for consumers and/or the user of the Instacart web page at Instacart.com).   On information and belief, when a consumer seeks to place a grocery order using the Instacart app or Instacart web page, a first request is generated to obtain the work schedule information for the known available independent contractors (shoppers) in order to give users delivery time choices.   If acceptable, the user has the option of choosing a delivery time, placing the order and completing the transaction.



*See* https://apps.apple.com/us/app/instacart-groceries-delivery/id545599256

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                    20



*See* https://www.instacart.com



*See* "How To Use Instacart To Have Groceries Delivered To Your Door," available at
https://www.youtube.com/watch?v=f_Zb3pNaJDg

*55.*   On information and belief, when a consumer submits a grocery order using the Instacart Accused Instrumentalities, the order comprises a second request to engage and obtain the Instacart shopper in the vicinity, and to thereafter receive delivery/status information.  On information and belief, the Instacart shoppers are notified via "push notification" when a new grocery order (which Instacart calls a "batch") is available for fulfillment.  Shoppers are notified of available batches based on their proximity to the store that the consumer has ordered from.  A batch is assigned to the first notified shopper that accepts the batch.  The second request is confirmed, and the consumer is given real-time information regarding the shopper's progress via the Instacart consumer App.

*See* "Instacart Shopper App Tutorial | Let's Batch Together," available at
https://www.youtube.com/watch?v=1jqRUrZnXLE

> Ordering made easy for groceries, produce, and household items
> 1. Enter your zipcode & select your favorite store
> 2. Add your items to your cart
> 3. Place your order
> 4. Chat with your Shopper and select replacements if an item is out of stock
> 5. Relax and stay notified when your delivery is on the way
> 6. Enjoy your food while you save time & money

*See* https://apps.apple.com/us/app/instacart-grocery-deliveries/id545599256

56.   The foregoing infringement on the part of Defendant has caused injury to Plaintiff.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '194 Patent.

57.   To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '194 Patent, such infringement is necessarily willful and deliberate.  Plaintiff believes and contends that Defendant's continuance of its clear and

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

inexcusable infringement of the '194 Patent post-notice is willful, wanton, malicious, bad-faith, deliberate, and/or consciously wrongful.

58. Including because of the foregoing, Plaintiff contends such activities by Defendant qualify this as an egregious case of misconduct beyond typical infringement, entitling Plaintiff to enhanced damages.  Including based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

59. Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT II**
**Infringement of U.S. Patent No. 7,490,086**

60. Plaintiff incorporates the above paragraphs by reference.

61. Defendant has been on actual notice of the '086 Patent at least as early as the date it received service of this Original Complaint.

62. On information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

63. On information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 18 of the '086 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

64. The Accused Instrumentalities comprise an apparatus comprising a memory device, a processing device, and a transmitter.  The infringing apparatus comprises servers, hardware, software, and a collection of related and/or linked web pages and mobile applications for providing recruitment information and services to individuals (including individuals, independent contractors, temporary workers, and/or freelancers) in the United States.  On information and belief, the Accused Instrumentalities comprise an apparatus with multiple interconnected infrastructures,

including but not limited to multiple data centers, including Amazon Web Services ("AWS") data centers located across the United States. *See* above.

65. On information and belief, the Instacart Accused Instrumentalities comprises data centers housing memory devices, processing devices, receivers, and transmitters. *See* above.

66. The Instacart Accused Instrumentalities comprise a memory device, which stores information regarding at individuals available for applying for a job opportunity or hiring need. On information and belief, the Instacart memory device stores information concerning shoppers who are available and willing to accept assignments (called "batches" by Instacart). Each such shopper, on information and belief, is employed by Instacart as an Independent Contractor and is retained by users of the Instacart apparatus to perform specific, defined tasks for the benefit of the user. *See* above.

67. The Instacart Accused Instrumentalities store work schedule information for each such shopper (independent contractor) by virtue of the Instacart Shopper App, which allows shoppers to set their availability for shopping gigs. Shoppers are notified of open delivery opportunities ("batches") shortly before the shopper's period of availability starts. *See* above.

68. The Instacart Accused Instrumentalities comprise a processing device which automatically detects searching events, which occur when a user of the Instacart apparatus places a grocery order. Each such order comprises a job posting ("batch") for Instacart shoppers, and otherwise comprises an event which creates an interest in an individual (the shopper) to seek and accept the position. *See* above.

69. The Instacart Accused Instrumentalities comprise a processing device which generates a message containing information regarding the individual (including but not limited to, availability, proximity, acceptance, identity, photo, estimated time of arrival, and location. The message is

transmitted to the user/consumer (employer or hiring entity) via the Instacart mobile app or via the Instacart website.  *See* above and below:



*See also* "How To Use Instacart To Have Groceries Delivered To Your Door," available at https://www.youtube.com/watch?v=f_Zb3pNaJDg

70.   The foregoing infringement on the part of Defendant has caused injury to Plaintiff.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '086 Patent.

71.   To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '086 Patent, such infringement is necessarily willful and deliberate.  Plaintiff believes and contends that Defendant's continuance of its clear and inexcusable infringement of the '086 Patent post-notice is willful, wanton, malicious, bad-faith, deliberate, and/or consciously wrongful.

72.    Including because of the foregoing, Plaintiff contends such activities by Defendant qualify this as an egregious case of misconduct beyond typical infringement, entitling Plaintiff to enhanced damages.  Including based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

73.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

### COUNT III
### Infringement of U.S. Patent No. 9,760,864

74.    Plaintiff incorporates the above paragraphs by reference.

75.    On information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

76.    On information and belief, Defendant has directly infringed at least Claim 1 of the '864 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

77.    The Accused Instrumentalities comprise an apparatus comprising a memory device, a receiver, a processor, and a transmitter.  The infringing apparatus comprises servers, hardware, software, and a collection of related and/or linked web pages and mobile applications for providing recruitment information and services to individuals (including individuals, independent contractors, temporary workers, and/or freelancers) in the United States.  On information and belief, the Accused Instrumentalities comprise an apparatus with multiple interconnected infrastructures, including but not limited to multiple data centers, including Amazon Web Services ("AWS") data centers located across the United States.  *See* above.

78.    On information and belief, the Instacart Accused Instrumentalities comprises data centers housing memory devices, processing devices, receivers, and transmitters.  *See* above.

79.    The Instacart Accused Instrumentalities comprise a memory device or database, which stores at least work schedule information and/or scheduling information for individual shoppers, each of whom are, on information and belief, employed by Instacart as Independent Contractors.  *See* above.

80.    The Instacart Accused Instrumentalities comprise a memory device, which stores information regarding at least work schedule information and/or scheduling information for individual shoppers in the Instacart network, each of whom are, on information and belief, employed by Instacart as independent contractors.  *See* above.

81.    The Instacart Accused Instrumentalities comprise a receiver for receiving a first request from a communication device associated with a hiring entity (*e.g.,* the user of the Instacart Mobile App for consumers and/or the user of the Instacart web page at Instacart.com).  On information and belief, when a consumer seeks to place a grocery order using the Instacart app or Instacart web page, a first request is generated to obtain the work schedule information for the known available independent contractors (shoppers) in order to give users delivery time choices.  If acceptable, the user has the option of choosing a delivery time, placing the order and completing the transaction.  *See* above.

82.    On information and belief, when a consumer submits a grocery order using the Instacart Accused Instrumentalities, the order comprises a second request to engage and obtain the Instacart shopper in the vicinity, and to thereafter receive delivery/status information.  On information and belief, the Instacart shoppers are notified via "push notification" when a new grocery order (which Instacart calls a "batch") is available for fulfillment.  Shoppers are notified of available batches based on their proximity to the store that the consumer has ordered from.  A batch is assigned to the first notified shopper that accepts the batch.  The second request is confirmed,

and the consumer is given real-time information regarding the shopper's progress via the Instacart consumer App.  *See* above.

83. The foregoing infringement on the part of Defendant has caused injury to Plaintiff.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '864 Patent.

84. Based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

85. Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT IV**
**Infringement of U.S. Patent No. 10,096,000**

86. Plaintiff incorporates the above paragraphs by reference.

87. On information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

88. On information and belief, Defendant has directly infringed at least Claim 1 of the '000 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

89. The Accused Instrumentalities comprise an apparatus comprising a memory device, a receiver, a processing device, and a transmitter.  The infringing apparatus comprises servers, hardware, software, and a collection of related and/or linked web pages and mobile applications for providing recruitment information and services to individuals (including individuals, independent contractors, temporary workers, and/or freelancers) in the United States.  On information and belief, the Accused Instrumentalities comprise an apparatus with multiple

interconnected infrastructures, including but not limited to multiple data centers, including Amazon Web Services ("AWS") data centers located across the United States.  *See* above.

90.     On information and belief, the Instacart Accused Instrumentalities comprise data centers housing memory devices, processing devices, receivers, and transmitters.  *See* above.

91.     The Instacart Accused Instrumentalities comprise a memory device or database, which stores at least work schedule information and/or scheduling information for individual shoppers in the Instacart network, each of whom are, on information and belief, employed by Instacart as independent contractors. *See* above.

92.     The Instacart Accused Instrumentalities store work schedule information for each such shopper (independent contractor) by virtue of the Instacart Shopper App, which allows shoppers to set their availability for shopping gigs.  Shoppers are notified of open delivery opportunities shortly before the shopper's period of availability starts.  *See* above.

93.     The Instacart Accused Instrumentalities comprise a receiver for receiving a first request from a communication device associated with a hiring entity (*e.g.,* the user of the Instacart Mobile App for consumers and/or the user of the Instacart web page at Instacart.com).  On information and belief, when a consumer seeks to place a grocery order using the Instacart app or Instacart web page, a first request is generated to obtain the work schedule information for the known available independent contractors (shoppers) in order to give users delivery time choices.  If acceptable, the user has the option of choosing a delivery time, placing the order and completing the transaction.  *See* above.

94.     On information and belief, when a consumer submits a grocery order using the Instacart Accused Instrumentalities, the order comprises a second request to engage and obtain the Instacart shopper in the vicinity, and to thereafter receive delivery/status information.  On information and

belief, the Instacart shoppers are notified via "push notification" when a new grocery order (which Instacart calls a "batch") is available for fulfillment.  Shoppers are notified of available batches based on their proximity to the store that the consumer has ordered from.  A batch is assigned to the first notified shopper that accepts the batch.  The second request is confirmed, and the consumer is given real-time information regarding the shopper's progress via the Instacart consumer App. *See* above.

95.    The foregoing infringement on the part of Defendant has caused injury to Plaintiff.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '000 Patent.

96.    Based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

97.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, GreatGigz Solutions, LLC respectfully requests the Court enter judgment against Defendant as follows:

1.      Declaring that Defendant has infringed each of the Asserted Patents;

2.      Awarding GreatGigz Solutions, LLC its damages suffered because of Defendant's infringement of the Asserted Patents;

3.      Awarding GreatGigz Solutions, LLC its costs, attorneys' fees, expenses, and interest;

4.      Awarding GreatGigz Solutions, LLC ongoing post-trial royalties; and

5.      Granting GreatGigz Solutions, LLC such further relief as the Court finds appropriate.

## JURY DEMAND

GreatGigz Solutions, LLC demands trial by jury, under Fed. R. Civ. P. 38.

Dated:  August 14, 2020                        Respectfully Submitted


                                               /s/ Thomas Fasone III
                                               Thomas Fasone III
                                               Texas Bar No. 00785382
                                               tfasone@ghiplaw.com
                                               M. Scott Fuller
                                               Texas Bar No. 24036607
                                               sfuller@ghiplaw.com
                                               Randall Garteiser
                                               rgarteiser@ghiplaw.com

                                               **GARTEISER HONEA, PLLC**
                                               119 W. Ferguson Street
                                               Tyler, Texas 75702
                                               Telephone: (903) 705-7420
                                               Facsimile: (888) 908-4400


                                               Raymond W. Mort, III
                                               Texas State Bar No. 00791308
                                               raymort@austinlaw.com
                                               **THE MORT LAW FIRM, PLLC**
                                               100 Congress Ave, Suite 2000
                                               Austin, Texas 78701
                                               Tel/Fax: (512) 865-7950

                                               **ATTORNEYS FOR
                                               GREATGIGZ SOLUTIONS, LLC**

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    32